UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

Case No. _____-CIV-

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

      v.

JUSTIN BLAKE BARRETT, and
GRAYSON BROOKSHIRE

    Defendants.

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

**SUMMARY OF THE ACTION**

1. This complaint concerns two North Carolina-based marketers who participated in a massive fraud involving the offer and sale of securities called "binary options" through false, misleading and deceptive videos, websites, and other forms of marketing promoted on the Internet and disseminated via email to millions of prospective investors in the U.S. and globally.

2. Beginning in at least January 2014 through June 2016 ("Relevant Period"), Justin Blake Barrett and his brother-in-law and business partner, Grayson Brookshire (collectively "Defendants"), launched and disseminated numerous marketing campaigns that fraudulently solicited and induced investors to open and fund unregistered, off-exchange binary options trading accounts. In offering these binary options, Defendants acted as so-called "affiliate marketers," who typically sell a third party's goods or services, often over the Internet, and

receive a commission for each sale. Here, Defendants promoted the purchase of binary options securities from unregistered third-party brokers.

3. Defendants' marketing campaigns included videos that touted a free software trading program running on autopilot and supposedly capable of generating large profits for investors who opened accounts on the instructions that followed the videos. These videos purported to show actual investors and real results, including people enjoying rich lifestyles achieved through binary options trading, and "live" demonstrations of people opening and funding accounts in "real time" and seeing their trading balances increase automatically. The participants in the videos insisted to viewers that these were actual events.

4. Yet what was depicted was entirely fiction. Paid actors pretended to be recent millionaires; fake testimonials claimed falsely that there was great wealth made by investing in, and using the free trading software to purchase, binary options; and fabricated photos showed only fictional account statements. The "live" demonstrations of profitable trading were shams.

5. Barrett and Brookshire typically partnered with other marketers in creating and disseminating at least fifteen fraudulent marketing campaigns for binary options. Defendants received a flat commission from a broker, customarily between approximately $350 and $450, for every customer who viewed their materials and then opened and funded a binary options account for trading.

6. Barrett and Brookshire were part of an informal group of prominent binary options marketers in the U.S. and abroad who coordinated their activities via an invitation-only Skype chat. In these chats, marketers announced their upcoming campaigns and agreed to disseminate each other's materials through their own email lists, thus vastly expanding the universe of possible investors to be defrauded. These marketers paid their fellow affiliates a

commission each time they emailed the marketers' campaign materials to customers who then opened and funded accounts. As a result, millions of prospective investors viewed these fraudulent binary options marketing campaigns. In addition to launching campaigns, Barrett and Brookshire disseminated fellow marketers' campaigns to their own proprietary email lists, and received a flat commission from fellow marketers for each recipient of those emails who then opened and funded an account to trade binary options.

7. By virtue of this conduct and other conduct described in this Complaint, Defendants violated the antifraud provisions of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5. Defendants were substantial participants in an illegal offering or sale of unregistered securities and also violated the registration provisions of Section 5 of the Securities Act, 15 U.S.C. § 77e. Defendants are each further liable pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and Section 20(e) of the Exchange Act, as aiders and abettors of other affiliate marketers' violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5. Defendants assisted these marketers' violations by disseminating the marketers' materially false and misleading marketing campaigns that offered binary options to prospective investors.

8. The Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, disgorgement of ill-gotten gains, injunctions, and such other relief as the Court may deem necessary and appropriate. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged herein.

## JURISDICTION AND VENUE

9. The Commission brings this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a). Defendants each have, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the activities alleged in this Complaint, including by making use of the Internet to offer securities and sending or receiving interstate email and participating in interstate voice or video calls.

10. Venue is proper here pursuant to Section 22(a) of the Securities Act and Section 27(a) of the Exchange Act because Defendants are found in, inhabit, or transact business in the Western District of North Carolina, and acts and transactions in violation of the federal securities laws as alleged in this Complaint have occurred within this district, among other places.

## DEFENDANTS

11. **Justin Blake Barrett**, age 36, resides in Indian Trail, North Carolina.

12. **Grayson Brookshire,** age 34, resides in Harrisburg, North Carolina. Barrett and Brookshire were partners in affiliate marketing and are brothers-in-law.

## FACTS

### I. AFFILIATE MARKETING IN BINARY OPTIONS SECURITIES

13. Binary options are financial instruments with a value tied to the price of other financial assets, including securities. An investor chooses whether the underlying asset's price will be above or below a certain price at a particular time (*e.g.,* will Apple stock be above $100 per share at 1 p.m. on a particular day). The options are considered "binary" because they carry only two possibilities: the investor whose prediction is correct makes money; the investor whose

prediction is incorrect loses the investment. Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset—instead, it is "cash settled."

14. Binary options referencing a security or securities within the meaning of Section 2(a)(1) of the Exchange Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), are themselves "securities" within the meaning of those provisions.

15. "Affiliate marketing" is a form of performance-based marketing primarily conducted via email solicitations and promotional materials made available on Internet websites. "Affiliate marketers" typically promote a product or service owned or provided by a third party (*e.g.,* a vendor.) Affiliate marketers are paid a commission by the vendor when they induce customers to buy the vendor's product or service. Here, binary options brokers paid the Marketing Defendants a pre-set commission (typically $350 to $450) for each customer who opened and funded an account with those brokers after viewing fraudulent marketing materials.

## II. DEFENDANTS' FRAUDULENT OFFERS OR SALES OF BINARY OPTIONS

16. Defendants began working as affiliate marketers in approximately 2010, selling various non-securities-related items. They learned of binary options affiliate marketing around 2012, when a prominent affiliate marketer said they could earn commissions at least three times greater than their then-current amounts. Defendants learned that customers could trade in binary options by opening and funding accounts with a broker, and that affiliate marketers could help grow the brokers' business by directing web traffic to the broker websites. Brokers paid affiliate marketers commission for each new funded account opened as a result of their solicitations.

17. In or about 2012, Defendants began disseminating binary options marketing campaigns that were generated by this same prominent affiliate marketer. In this role, Barrett

and Brookshire acted as so-called "sub-affiliate marketers," *i.e.,* they disseminated marketing materials typically created by other marketers.

18. Over the next two years, Barrett and Brookshire sporadically participated in binary options campaigns as sub-affiliates, sending other marketers' fraudulent campaigns to their email lists. These third-party campaigns included videos containing false and misleading statements designed to create the false impression that they reflected real events. For example, the videos included: (1) guarantees that the trading software would automatically generate significant profits for customers once they opened and funded a binary options account with a "recommended" Broker; (2) actors pretending to be real users or owners of the trading software; and (3) depictions of customer bank and trading statements that were fictitious, fictitious testimonials and fake "live" demonstrations, all of which falsely claimed profitable results generated by the automated trading software. Defendants disseminated these third-party affiliate materials knowing, or recklessly failing to know, that they were materially false and misleading.

19. By 2014, Barrett and Brookshire began launching their own binary options campaigns. During the Relevant Period, Defendants launched one binary options campaign themselves and launched at least another fourteen (14) campaigns in which they partnered with other affiliates. The fifteen affiliate marketing campaigns for binary options consisted of:

   a) Secret Wealth Club (July 2014)
   b) Fast Mobile Profits (November 2014)
   c) The Freedom Project (November 2014),
   d) The Truth About Cash (December 2014),
   e) Home Online Earners (April 2015),
   f) Wealthy Wheat Trader (May 2015),
   g) Peak Profits Formula (June 2015),
   h) HFT Shield (August 2015),
   i) Overnight Profits (September 2015),
   j) Coffee Cash Cheat Sheet (November 2015),
   k) Medallionaire App (December 2015),
   l) Stark Trading Systems (February 2016),

  m) Trade Tracker Pro (February 2016),
  n) Million Dollar Challenge (May 2016), and
  o) Globe Traders (May 2016).

  20. As with the campaigns they disseminated as sub-affiliates, the campaigns launched by Defendants featured videos that contained false and misleading statements designed to create the false impression that they reflected real events, including (1) guarantees that the trading software would automatically generate significant profits for customers after they opened and funded accounts with a broker; (2) actors pretending to be real users or owners of the trading software; and (3) depictions of customer bank and trading statements that were fictitious, fictitious testimonials and fake "live" demonstrations. Defendants knew that their marketing materials were materially false and misleading.

  21. For their launches, Defendants frequently worked with an affiliate marketer based in Europe who created many of the solicitation materials and served as the primary contact with broker intermediaries. Barrett and Brookshire also generated certain false and misleading statements used in the marketing campaigns for binary options. They drafted false email solicitations, participated in aspects of creating the fictitious videos, and provided input to ensure a successful campaign.

  22. One such campaign launched by Defendants around August 2015 included a depiction of trading profits in a bank account and PayPal records that were fictitious, fictitious testimonials, and unsubstantiated promises to "make an average of at least $3,150 per day on complete autopilot!" Another such campaign included a video that depicted fictitious customer account statements, fake "live account" statistics over time, and false claims that the trading software was "RISK FREE." These statements were false.

23. Other videos launched by Defendants falsely claimed that the advertised trading system had been tested for nine years with only one month showing any losses and that (fake) beta testers made between $12,521 and $146,334 per month.

24. Barrett and Brookshire also recruited other affiliate marketers to disseminate Defendants' marketing materials on their behalf. For each of their campaigns, Barrett and Brookshire knew or were reckless in not knowing that the solicitation materials included false and misleading statements about the purported automated trading software's profits, risk of loss, limited availability, and the system's functionality and performance.

25. Defendants also caused thousands of additional persons to open and fund binary options accounts by acting as "sub-affiliates" during the Relevant Period and disseminating solicitations in the U.S. and abroad for various fraudulent binary options advertising campaigns launched by other marketers. When acting as a sub-affiliate for other marketers' campaigns, Defendants received commissions for each customer to whom they sent the affiliate's marketing materials, and who opened and funded an account. Additionally, Defendants frequently earned prizes based on their performance, including thousands of dollars in cash and/or in kind rewards.

26. Defendants knew or were reckless in not knowing that the materials they disseminated as sub-affiliates were false and misleading.

27. During the Relevant Period, the binary options campaigns launched by Defendants and disseminated by them as sub-affiliates together were viewed at least six million times; at least 8,000 customers opened a new binary options account at various broker firms and deposited at least $2 million in initial investments into those accounts.

28. Defendants worked together on all binary options affiliate marketing and split all profits derived from those activities during the Relevant Period.

29. In approximately mid-2016, Barrett and Brookshire voluntarily exited the binary options affiliate marketing industry after seeing media articles describing the fraudulent nature of binary options trading, including fraudulent acts by brokers.

## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act

30. Paragraphs 1-29 are realleged and incorporated by reference herein.

31. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a) with scienter, employed devices, schemes, or artifices to defraud;

(b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

32. By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

33. Paragraphs 1-32 are realleged and incorporated by reference herein.

34. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

35. By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

**Unregistered Offer or Sale of Securities**
**Violations of Section 5 of the Securities Act**

36. Paragraphs 1-35 are realleged and incorporated by reference herein.

37. No registration statement had been filed or was in effect for any of the security-based binary options offered or sold through the Defendants' marketing campaigns.

38. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such securities.

39. By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 5 of the Securities Act, 15 U.S.C. §§ 77e.

## FIFTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Aiding and Abetting Violations of Section 17(a) of the Securities Act

40. Paragraphs 1-39 are realleged and incorporated by reference herein.

41. Defendants knowingly or recklessly provided substantial assistance to other affiliate marketers' violations of Section 17(a) of the Securities Act. By reason of the foregoing, Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), deems Defendants in violation of Section 17(a) of the Securities Act to the same extent as the others to whom such assistance was provided, and unless enjoined, each of them will again aid and abet violations of Section 17(a).

## SIXTH CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against all Marketing Defendants)

42. Paragraphs 1-41 are realleged and incorporated by reference herein.

43. Defendants knowingly or recklessly provided substantial assistance to other affiliate marketers' violations of Section 10(b) and Rule 10b-5. By reason of the foregoing, Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), deems Defendants to be in violation of Section 10(b) of the Exchange Act , 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, to the same extent as the others to whom such assistance was provided. Unless enjoined, each of them will again aid and abet violations of those provisions.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

    a) Find that Defendants committed the alleged violations;

    b) Order Defendants to disgorge, with prejudgment interest, all ill-gotten gains they received or derived from the activities set forth in this Complaint, and to repatriate any

11

ill-gotten funds or assets they caused to be sent overseas;

c) Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

d) Order Defendants prohibited from, directly or indirectly, including through any entity he owns or control, participating in the marketing, offer or sale of securities over the Internet or by email or other forms of electronic communication;

e) Permanently enjoin Defendants from directly or indirectly violating Sections 5 and 17(a) of the Securities Act, 15 U.S.C. §§ 77e & 77q(a), and Sections 10(b) and 20(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78t(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

f) Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

g) Grant such other and further relief as may be necessary or appropriate.

Dated: September 27, 2018

Respectfully submitted,

/s/ Kenneth W. Donnelly

Kenneth W. Donnelly (DC # 462996)
Trial Counsel for Plaintiff
**Securities and Exchange Commission**
100 F Street, N.E.
Washington, DC 20549-5949
Tel. (202) 551-4946
Fax (202) 772-9282
Email: donnellyk@sec.gov

Of Counsel:

Jennifer A. Leete
Michael S. Fuchs
Jason M. Anthony